IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| CHAD LYONS; and CHRISTIAN TAVERAS, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>IR LABS DE, LLC; and SOURCETEK, INC.<br><br>Defendants. | DOCKET NO. 4:24-cv-00002-SHL-SBJ<br><br><br>**AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL WARN ACT 29 U.S.C. § 2101, *ET SEQ.* AND FAIR LABOR STANDARDS ACT 29 U.S.C. § 201, *ET SEQ.*** |

**COME NOW**, Plaintiffs, Chad Lyons, and Christian Taveras and file this Amended Class and Collective Action Complaint against Defendants IR Labs DE, LLC and SourceTek, Inc., on their own behalf and on behalf of several hundred other employees, challenging Defendants' violation of the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (the "WARN Act") and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA").

## PARTIES

1.       Plaintiff, Chad Lyons ("Lyons"), is an adult resident of Iowa.  Plaintiff worked for IR Labs DE, LLC prior to his termination on or about September 20, 2023.

2.       Plaintiff, Christian Taveras ("Taveras"), is an adult resident of Florida.  Plaintiff worked for SourceTek, Inc. and on behalf of IR Labs De, LLC prior to his termination on or about September 20, 2023.

3.       Plaintiffs bring this lawsuit as a Rule 23 class action on behalf of all affected employees who were employed by IR Labs DE, LLC and SourceTek, Inc. (collectively "the Defendants") and were terminated on or about September 20, 2023.

4.      Plaintiffs likewise bring this lawsuit as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of all similarly situated employees who were or are employed by the Defendants.

5.      Defendant, IR Labs DE, LLC ("Innovation Refunds") is a Limited Liability Company formed under the laws of the State of Delaware.  Innovation Refunds' headquarters or principal place of business is located in the State of Iowa.  Innovation Refunds can be served with process by and through its agent, Cogency Global, Inc., 100 Court Avenue, Suite 201 Des Moines, IA 50309.

6.      Defendant SourceTek, Inc., ("SourceTek") is a Corporation formed in the State of Florida.  SourceTek can be served with process by and through its agent, Spiegel & Utrera, P.A., 1840 Southwest 22nd Street 4th Floor, Miami, Florida 33145.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

8.      This Court has personal jurisdiction over Defendant, Innovation Refunds, because Innovation Refunds is headquartered in this District and conducts substantial business operations in the State of Iowa.  Further, this Court may exercise personal jurisdiction over Innovation Refunds because the personnel decisions giving rise to the layoffs that are the subject of this suit were made by Innovation Refunds employees who work at the headquarters in Iowa.

9.      This Court has personal jurisdiction over SourceTek because Souretek conducts substantial business operations in the State of Iowa.  Further, this Court may exercise personal jurisdiction over SourceTek because the personnel decisions giving rise to this suit affected SourceTek employees who worked in Iowa.  Moreover, this Court may exercise personal jurisdiction over SourceTek because it employed individuals who worked in Iowa, and SourceTek

entered into a contract to "lease" its workforce to Innovation Refunds – which was to be performed at least in part in Iowa.

## FACTUAL ALLEGATIONS

### *The Early Stages and Growth of Innovation Refunds*

10.     Innovation Refunds is a "consulting" firm, headquartered in Des Moines, Iowa, which was created for the purpose of capitalizing on the Employee Retention Credit.

11.     Innovation Refunds ran aggressive, nationwide marketing campaigns across multiple media forums to encourage small business owners to apply for the Employee Retention Credit and hire Innovation Refunds to assist them with the process.

12.     These marketing campaigns included celebrities such as Ty Burrell.

13.     Mr. Burrell's picture was featured on Innovation Refunds' website:



14.     Mr. Burrell is also featured in commercials that were recorded and ran on television nationwide by Innovation Refunds.

15.     Innovation Refunds' marketing campaign was successful.

16.     According to Innovation Refunds' website, the company has processed over 20,000 Employee Retention Credit returns for their customers.

17.     Upon information and belief, Innovation Refunds charged its customers 25% of the total refund that was received by each customer.

18.     Upon information and belief, the average refund received by Innovation Refunds' customers was approximately $250,000.00.

19.     Rob Domenico, Innovation Refunds' former executive vice president of financial partnerships, claims that Innovation Refunds has processed nearly $7 billion worth of claims for their customers.

20.     Twenty-five percent of $7 billion is a lot of money.

21.     Upon information and belief, Innovation Refunds has generated in excess of $1 billion in revenue during the approximate three years it has been processing Employee Retention Credit claims for its customers.

22.     While Innovation Refunds was accelerating, the company hosted lavish parties for its employees and its partner accounting and law firms.

23.     For example, during one holiday party, Innovation Refunds hired a marching band and interpretation artists and even filled the venue with Innovation Refunds-themed ice sculptures.

*The Logistics of How Innovation Refunds Earned Fees from the Employee Retention Credit*

24.     In order to obtain the Employee Retention Credit, business file amended payroll tax forms – called 941-X – for each quarter the business is "eligible."

25.     Once this tax return is completed and filed with the Internal Revenue Service, it took upwards of six months between the time of filing and when Innovation Refunds' customers received the refund.

26.     As part of its contract with its customers, Innovation Refunds was not paid any fees from the customers until the customers received the refund money from the Treasury.

27. Thus, Innovation Refunds had a significant lag time from when the work it performed was completed and when it was paid for the services it provided.

28. By way of example, if Innovation Refunds ran a commercial on television in January of 2023 and a prospective customer called Innovation Refunds or visited its website in response, that customer would not receive any money until at least six months later.

29. Consequently, Innovation Refunds would not be paid any fees for its work until approximately six months later.

30. From the date of its inception through the majority of 2023, Innovation Refunds grew drastically.

31. Upon information and belief, at its peak, Innovation Refunds employed upwards of one thousand (1000) employees.

32. Innovation Refunds knew that its primary service, marketing to small businesses regarding the Employee Retention Credit, had a short shelf life.

33. Once the time period for businesses across the United States to amend their quarterly payroll tax returns for 2020 and 2021 lapsed, Innovation Refunds would lose the majority of its revenue.

34. Thus, Innovation Refunds employed a very aggressive growth and sales strategy to encourage its employees to process as many applications for the Employee Retention Credit as possible.

35. As one former employee explained Innovation Refunds' approach, "[g]et as many deals through the door and let the IRS decide who was qualified."

36. Innovation Refunds set company-wide sales goals that were very high.

37.     To meet these goals, Innovation Refunds pushed its employees to repeatedly call any leads – whether new or old – and convince them to hire Innovation Refunds.

38.     As part of this strategy, Innovation Refunds created a bonus system whereby it agreed to provide all of its employees with bonuses so long as the company, as a whole, processed a certain number of Employee Retention Credit returns.

39.     For example, Innovation Refunds agreed to pay bonuses of $10,000.00 to every employee once the company submitted Employee Retention Credit returns for 10,000 customers.

40.     These bonus payments increased when Innovation Refunds reached a certain amount of refunds processed.

41.     The largest bonus promised to employees of Innovation Refunds was a $100,000.00 bonus payment to all employees hired by March 31, 2023, if Innovation Refunds closed 50,000 lifetime deals.

42.     Innovation Refunds made two bonus payments to all of its employees for reaching these certain thresholds.  The first was for $10,000.00, and the second was for $25,000.00.

### The Use of Staffing Agencies

43.     Sometime around the end of 2022 and beginning of 2023, Innovation Refunds decided to ramp up its marketing efforts in hopes of generating thousands, or tens of thousands, of new leads and ultimately clients.

44.     As part of this plan, Innovation Refunds knew that it would need to significantly expand its sales and processing teams.

45.     Rather than offering direct employment to the needed additional employees, Innovation Refunds decided to partner with staffing agencies – namely: Recruitful, and SourceTek (collectively the "Staffing Agencies").

46.     Upon information and belief, the employment structure involved Innovation Refunds paying an hourly rate for all "account executives," "client success champions," "processing specialists," and others to the Staffing Agencies.

47.     The Staffing Agencies would pay "account executives," "client success champions," "processing specialists," and others they directly employed at a rate less than the amount paid by Innovation Refunds.

48.     The difference between the rate Innovation Refunds paid the Staffing Agencies and the rate the Staffing Agencies paid the employees they directly employed was the profit margin the Staffing Agencies generated through this partnership.

<u>*WARN Act Allegations – Innovation Refunds*</u>

49.     As of September 2023, Innovation Refunds employed upwards of 350 employees.

50.     On September 19, 2023, Innovation Refunds notified at least 157 of its employees that they were terminated effective September 20, 2023.

51.     All 157 or more employees either worked at, reported to, were assigned work from, or reported to the headquarters in Des Moines, Iowa.

52.     All 157 or more employees' "single site of employment" is properly considered to be the headquarters in Des Moines.

53.     Plaintiff, Lyons, was one of those 157 or more employees.

54.     Plaintiff, Lyons, was assigned work from and reported to the headquarters in Des Moines, Iowa.

55.     The only notice Plaintiffs were provided of their September 20, 2023, layoff was the September 19, 2023 letter.

56.     Plaintiff, and all other employees who were laid off within the ninety days prior to September 20, 2023, were not provided with sixty days' worth of advance notice.

57.     At all relevant times, Innovation Refunds employed 100 or more employees, exclusive of part-time employees, (i.e., those employees who had worked few than 6 of the 12 months prior to the date notice was required to be given or who had worked fewer than an average of 20 hours per week during the 90 day period prior to the date notice was required to be given), or employed 100 or more employees who in the aggregate worked at least 4,000 hours per week exclusive of hours of overtime within the United States.

58.     Thus, Innovation Refunds is subject to the advance notice requirements as set forth in 29 U.S.C. § 2102.

59.     As such, Innovation Refunds' failure to provide the requisite sixty days' worth of notice amounts to a violation of the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").

### *WARN Act Allegations – SourceTek*

60.     As of September 2023, SourecTek employed upwards of 300 employees that it "leased" to Innovation Refunds.

61.     These employees included "account executives" and "customer success champions" or "processing specialists," among others.

62.     These employees, including Taveras, were on payroll with SourceTek.

63.     However, these employees were "leased" to Innovation Refunds to work as an integral portion of Innovation Refunds' sales and processing teams.

64.     There were approximately 300 individuals employed by SourceTek and leased to Innovation Refunds.

65.     These employees were either assigned to Innovation Refunds' headquarters in Des Moines, Iowa or were assigned work from or reported to Innovation Refunds' headquarters in Des Moines, Iowa.

66.     These employees directly reported to either "Sales Managers" or "Operations Managers" that were directly employed with Innovation Refunds and worked at Innovation Refunds' headquarters in Des Moines, Iowa.

67.     All approximately 300 of these employees' "single site of employment" is properly considered to be the headquarters in Des Moines.

68.     On or about September 20, 2023, at least ninety percent (90%) of these employees were terminated effective immediately.

69.     These employees were not provided with any written notice of their termination.

70.     Plaintiff, Taveras, and all other employees who laid off within the ninety days prior to September 20, 2023, were not provided with sixty days' worth of advance notice.

71.     At all relevant times, SourceTek employed 100 or more employees, exclusive of part-time employees, (i.e., those employees who had worked few than 6 of the 12 months prior to the date notice was required to be given or who had worked fewer than an average of 20 hours per week during the 90 day period prior to the date notice was required to be given), or employed 100 or more employees who in the aggregate worked at least 4,000 hours per week exclusive of hours of overtime within the United States.

72.     Thus, SourceTek is subject to the advance notice requirements as set forth in 29 U.S.C. § 2102.

73.     As such, SourceTek's failure to provide the requisite sixty days' worth of notice amounts to a violation of the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").

*FLSA Allegations – Innovation Refunds*

74.     Innovation Refunds is a business enterprise that, upon information and belief, generated in excess of $1 billion in revenue during an approximate three-year period.

75.     Plaintiff, Lyons, and all other employees of Innovation Refunds frequently worked more than forty (40) hours per week.

76.     Innovation Refunds made at least two bonus payments to all its employees.  One of which was for $25,000 and paid in approximately January of 2023.  Another was for $10,000 and paid in approximately June of 2023.

77.     Each employee was entitled to the bonus so long as he or she was hired by a certain date, and the company met the milestone goals set by management at Innovation Refunds.

78.     These bonuses were labeled as "milestone" payments on each employee's paystub.

79.     These bonuses were promised to employees in order to induce the employees to close more deals and remain employed at Innovation Refunds.

80.     Moreover, these bonuses were used to entice employees to come and work for Innovation Refunds.

81.     From the time the bonus payments were announced through the date the second bonus payment was made, Plaintiff worked overtime hours every week.

82.     Because these bonuses were promised beforehand by Innovation Refunds management, were tied to company specific goals, were used to recruit employees and retain those who worked for Innovation refunds, the bonuses are nondiscretionary.

83.     Innovation Refunds paid Plaintiffs and all other employees overtime for their hours reported on their timesheets in excess of forty (40) per week.  However, Innovation Refunds failed to include the employees' nondiscretionary, performance-based pay into its calculation of each employee's "regular rate of pay" – as mandated by 29 U.S.C. § 207(e).

84.     Once the milestone thresholds were met and the bonuses were paid, Innovation Refunds was required to apportion the bonuses over the workweeks of the period that the bonuses were earned.

85.     Innovation Refunds did not apportion the bonuses over the weeks they were earned, and thus, did not provide Plaintiff with the additional overtime compensation she is owed for those weeks the bonus was earned.

86.     Further, Plaintiff Lyons also earned commissions for closing a certain number of deals during a certain time period.

87.     Innovation Refunds implemented such a commission program to encourage its employees to close as many deals as possible.

88.     Once each employee, including Lyons, met the requisite number of deals closed in the requisite time period, Innovation Refunds was obligated to pay each employee the commission due.

89.     These payments were labeled as "commission" on each employee's paystub.

90.     Innovation Refunds paid Plaintiff, Lyons, and all other employees overtime for their hours reported on their timesheets in excess of forty (40) per week.  However, Innovation Refunds failed to include the employees' commission payments into its calculation of each employee's "regular rate of pay" – as mandated by 29 U.S.C. § 207(e).

91.     By neglecting to include this amount of nondiscretionary, performance-based pay into each employee's "regular rate of pay," Innovation Refunds implemented a continuous and systematic process and procedure which deprived Plaintiff and all other non-exempt, hourly wage employees of the overtime they are due pursuant to 29 U.S.C. § 207.

92.     Innovation Refunds knew that – or acted with reckless disregard as to whether – its refusal or failure to properly compensate Plaintiffs and the Collective Members for their overtime work would violate the FLSA, and Innovation Refunds was aware of the FLSA's overtime compensation requirements.

<em>FLSA Allegations – SourceTek</em>

93.     SourceTek is a business enterprise that generates millions of dollars in revenue per year.

94.     SourceTek provides staffing services for companies in multiple states and employs individuals who reside in multiple states.

95.     Plaintiff, Taveras, and all other employees of SourceTek were classified as non-exempt from overtime and paid on an hourly basis.

96.     Plaintiff, Taveras, and all other employees of SourceTek routinely worked in excess of forty (40) hours per week.

97.     When Plaintiff, Taveras, and the other employees of SourceTek were hired, they all underwent training that was jointly conducted by Innovation Refunds and SourceTek.

98.     During this training, representative of Innovation Refunds and SourceTek told Plaintiff, Taveras, and the other employees of SourceTek that although they were hourly, Innovation Refunds would not pay for any hours in excess of forty (40).

99.     Thus, Plaintiff, Taveras, and the other employees of SourceTek were instructed to list forty (40) hours on their respective timesheets regardless of the hours actually worked.

100.     By instructing Plaintiff, Taveras, and the other employees of SourceTek to not list any hours more than forty (40) on their timesheets, SourceTek implemented a continuous and systematic process and procedure which deprived Plaintiff and all other non-exempt, hourly wage employees of the overtime they are due pursuant to 29 U.S.C. § 207.

101.     SourceTek knew that its refusal or failure to properly compensate Plaintiffs and the Collective Members for their overtime work would violate the FLSA, and SourceTek was aware of the FLSA's overtime compensation requirements.

*"Single Employer" Allegations – Innovation Refunds*

102.     The WARN Act imposes liability for violations of its notice requirement on more than merely the entity that directly employed the employees who suffer an employment loss.

103.     Here, Innovation Refunds should be considered a "single employer" with SourceTek because it (1) exerted significant control over the employees, including the decision to terminate all of them on or about September 20, 2023, (2) interjected itself into the payroll practices of SourceTek such that it created unity in their personnel policies, and (3) Innovation Refunds' operations depended upon the employees provided by SourceTek.

104.     All employees of SourceTek who suffered an employment loss on or about September 20, 2023, experienced said job loss as a direct consequence of Innovation Refunds' decision to terminate a large portion of its direct employees.

105.     After all, the "mass layoffs" that the employees of SourceTek fell victim to occurred on the same day as the "mass layoff" that occurred on or about September 20, 2023 to Innovation Refunds' direct employees.

106.    Moreover, as mentioned previously, Innovation Refunds jointly administered the training program that all employees of SourceTek underwent.

107.    During these trainings, representatives of Innovation Refunds told the SourceTek employees that they could work as many hours as they wanted to but there would be no overtime payment for those hours – despite the fact that the employees were designated as non-exempt from overtime requirements.

108.    Innovation Refunds directive on the lack of overtime pay was probably due to its desire to keep the pay structure of the employees it directly employed similar with those individuals that it "leased" from the Staffing Agencies.

109.    By way of example, Innovation Refunds deemed its "account executives" exempt from the FLSA's overtime wage requirement.

110.    The "account executives" that worked for Innovation Refunds through the Staffing Agencies, however, were non-exempt from the FLSA's overtime wage requirement.

111.    Thus, if the "account executives" that worked Innovation Refunds through the Staffing Agencies were paid for the hours they worked in excess of forty (40) per week, the Staffing Agency "account executives" would be obtaining substantially more in compensation than those directly employed through Innovation Refunds.

112.    This discrepancy in pay is complicated by the fact that the overtime that was wrongfully withheld from the "account executives" is substantial.

113.    The "account executives" were routinely working fifty-five (55) or more hours in a week.  Given their base hourly rate and the commissions they earned, the overtime they are owed could amount to one thousand dollars, or more, per week.

114.     This pay discrepancy would certainly create issues for Innovation Refunds' directly employed "account executives" who, after all, worked alongside and were managed subject to the same management team as the Staffing Agency "account executives."

115.     Further, Innovation Refunds' operations were dependent upon the "account executives," "client success champions," "processing specialists," and others supplies by the Staffing Agencies.

116.     Again, Innovation Refunds existed primarily for the purpose of convincing small business owners to hire Innovation Refunds to assist them in the filing for the Employee Retention Credit.

117.     "Account executives" were the persons responsible for calling on the leads that were generated through Innovation Refunds marketing efforts, verifying the potential client had the requisite number of employees on payroll, and then convincing the prospective client to hire Innovation Refunds.

118.     The "client success champions" or "processing specialists" were the persons responsible for ensuring the proper documentation was obtained from the prospective client and ensuring said documentation was passed along to the third-party law firms and accounting firms that Innovation Refunds contracted with to provide some sort of "eligibility" determination.

119.     To state succinctly, Innovation Refunds could not operate without "account executives," "client success champions," "processing specialists," and others that were supplied by the Staffing Agencies.

120.     Given the control exercised by Innovation Refunds over the employees supplied by SourceTek, the common personnel policies, and Innovation Refunds' dependency on SourceTek, the Defendants amount to a "single employer" for purposes of the WARN Act.

*"Joint Employer" Allegations – Innovation Refunds*

121.    Similar to the WARN Act, the FLSA imposes liability for violations on more than merely the entity that directly employed the employees who suffer an employment loss.

122.    Courts consider various factors to determine if the alleged "joint employer(s)" has operating control over the employees.

123.    Here, Innovation Refunds should be considered a "joint employer" with SourceTek because it (1) exerted significant control over the employees, including the decision to terminate all of them on or about September 20, 2023, (2) managed their day-to-day performance, and (3) determined the rate or method the employees were paid.

124.    Again, all employees of SourceTek who suffered an employment loss on or about September 20, 2023, experienced said job loss as a direct consequence of Innovation Refunds' decision to terminate a large portion of its direct employees.

125.    The job losses incurred on or about September 20, 2023, by the employees of SourceTek were a product of Innovation Refunds' decision to terminate a large portion of its workforce.

126.    Innovation Refunds also directly supervised the employees supplied by SourceTek.

127.    Typically, the "account executives" supplied by SourceTek would report to a "sales manager" that was directly employed through Innovation Refunds.

128.    That "sales manager" would evaluate the performance of each "account executive" including, but not limited to, setting performance requirements and ensuring those requirements were met.

129.     Similarly, the "client success champions" or "processing specialists" supplied by SourceTek typically reported to a "operations manager" that was directly employed through Innovation Refunds.

130.     That "operations manager" would evaluate the performance of each "client success champions" or "processing specialists" including, but not limited to, setting performance requirements and ensuring those requirements were met.

131.     However, the interrelatedness between the employees supplied by the Staffing Agencies and those directly employed with Innovation Refunds became even more apparent at other times.

132.     Innovations Refunds frequently employed "sales managers" and "operations managers" that were not directly employed with Innovation Refunds.

133.     Often, these "sales managers" and "operations managers" were supplied by the Staffing Agencies, including SourceTek, yet supervised "account executives" and "client success champions" or "processing specialists" that were directly employed with Innovation Refunds.

134.     Thus, there were numerous occasions where an Innovation Refunds direct hire would report to a manager that was supplied by one of the Staffing Agencies – such as SourceTek.

135.     Moreover, there were also numerous occasions where an employee supplied by one of the Staffing Agencies would report to a "sales manager" or "operations manager" supplied by a different Staffing Agency.  For example, an "account executive" directly employed with SourceTek might report to a "sales manager" who is directly employed with Recruitful.

136.     In any event, all employees that were supplied by the Staffing Agencies were instructed to present themselves as employees of Innovation Refunds.

137.    When an "account executive" supplied by SourceTek was communicating with a prospective client, that "account executive" was instructed to refer to him/herself as an Innovation Refunds employee.

138.    The same is true with "client success champions" or "processing specialists."  In any interaction they had with Innovation Refunds' clients, they were to hold themselves out as an Innovation Refunds employee – not as an employee of Sourcetek, their direct employer.

139.    The employees supplied by SourceTek had Innovation Refunds email addresses which contained the domain name "@innovationrefunds.com" and contained signature blocks which contained the Innovation Refunds logo.

140.    Last, Innovation Refunds involvement in the Staffing Agencies' pattern or practice of withholding overtime pay to their employees exhibits Innovation Refunds' control over each employee's rate and method of pay.

141.    Even though the SourceTek's employees were not on Innovation Refunds' payroll, Innovation Refunds was, for all intents and purposes, their "employer."

### CLASS ACTION ALLEGATIONS

142.    Plaintiffs, Lyons and Taveras, bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> **Nationwide Class**
>
> All employees of Innovation Refunds and SourceTek who suffered an employment loss within the 90 days before September 20, 2023 and were not provided advance notice.

143.    Numerosity – Fed R. Civ. P. 23(a)(1).  The Class contains hundreds of individuals, the joinder of which in one action would be impracticable.  The exact number or identification of

the Class Members is presently unknown.  The identity and number of the Class Members is ascertainable and can be determined from the Defendants' records.

144.    <u>Predominance of Common Questions - Fed R. Civ. P. 23(b)(3)</u>.  The questions of law and fact common to the Class predominate over questions affecting only individual Class Members, and include, but are not limited to:

a.    Whether the Class Members were employees of the Defendants;

b.    Whether Defendant gave the requisite 60 days' advanced written notice;

c.    Whether Defendant can avail itself of any affirmative defenses;

d.    Whether the proposed class has enough members for this class action to proceed;

e.    Whether Defendant paid the Class Members 60 days' wages and benefits as required by the WARN Act; and

f.    Whether the Defendants amount to a "single employer."

145.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Individual questions, if any, are not prevalent in comparison to the common questions that dominate this action.

146.    <u>Typicality – Fed R. Civ. P. 23(a)(3).</u>  Plaintiffs' claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

147.    <u>Adequacy – Fed R. Civ. P. 23(a)(4); 23(g)(1).</u>  Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interest incompatible with the interests of the Class, and have retained counsel competent and experienced in such class action litigation.

148.  <u>Superiority – Fed. R. Civ. P. 23(b)(3).</u>  This case is best suited as a class action because individual litigation of each Class Members' claims would be impracticable and unduly burdensome on the courts.  Because of the size of each individual Class Members' claim, no Class Member could afford to seek legal redress for the wrongs identified in the Complaint.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**<u>COLLECTIVE ACTION ALLEGATIONS</u>**

*<u>Innovation Refunds Subclass</u>*

149.  Plaintiff, Lyons, brings this action pursuant to the Fair Labor Standards Act 29 U.S.C. § 201 *et seq.* on his own behalf and as representative of individuals similarly situated who are former and current employees of Innovation Refunds.

150.  Defendant Innovation Refunds subjected all of their hourly, nonexempt employees, including Plaintiff and the Collective Members, to their policy of failing to properly calculate and pay the employees' overtime wages.

151.  At all relevant times, Plaintiffs and the Collective Members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subject to Innovation Refunds' decision, policy, plan, and common program, practices, procedures, protocols, routines, and rules of failing to pay Plaintiffs and the Collective Members all overtime wages required by 29 U.S.C. § 207(a).

152.  Plaintiffs' claims stated in this Complaint are essentially the same as those of the Collective Members. This action is properly maintained as a collective action because in all pertinent aspects the employment relationship of individuals similarly situated to Plaintiff is identical or substantially similar.  Specifically, all non-exempt, hourly wage employees are entitled

20

to have any nondiscretionary bonuses included in their regular rate calculation.   Innovation Refunds systematically failed to apportion the bonuses payments made to all hourly, non-exempt employees into their regular rate calculation – thereby depriving them of the overtime compensation they are due.

153.   The Collective Members perform or have performed the same or similar work as Plaintiffs.

154.   Innovation Refunds' failure to pay overtime compensation required by the FLSA results from generally applicable policies or practices and does not depend on the personal circumstances of Plaintiffs or the Collective Members.

155.   Although the exact amount of damages may vary among the Collective Members, the damages for the Collective Members can be easily calculated by a simple formula.   The claims of all Collective Members arise from a common nucleus of facts.   Liability is based on a systematic course of wrongful conduct by Innovation Refunds that caused harm to all the Collective Members.

156.   Innovation Refunds was aware or should have been aware that federal law prohibited them from not paying their employees all overtime wages as required by the FLSA.

157.   Innovation Refunds' unlawful conduct has been widespread, repeated, and consistent.

158.   This action is properly brought and maintained as an opt-in collective action pursuant to 29 U.S.C. § 216(b).

159.   Upon information and belief, the individuals similarly situated to Plaintiff contains more than one hundred (100) individuals.   The exact number or identification of similarly situated employees is presently unknown.   The identity and number of the employees is ascertainable and can be determined from Innovation Refunds' records.

160.    Notice can be provided to the Collective Members by First Class Mail to the last address known to Innovation Refunds, via email at the last known email address known to Innovation Refunds, and by text message to the last known telephone number known to Innovation Refunds.

*SourceTek Subclass*

161.    Plaintiff, Taveras, bring this action pursuant to the Fair Labor Standards Act 29 U.S.C. § 201 *et seq.* on his own behalf and as representative of individuals similarly situated who are former and current employees of SourceTek.

162.    Defendant SourceTek subjected all of their hourly, nonexempt employees, including Plaintiff and the Collective Members, to their policy of failing to properly calculate and pay the employees' overtime wages.

163.    At all relevant times, Plaintiff and the Collective Members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subject to SourceTek's decision, policy, plan, and common program, practices, procedures, protocols, routines, and rules of failing to pay Plaintiff and the Collective Members all overtime wages required by 29 U.S.C. § 207(a).

164.    Plaintiff's claims stated in this Complaint are essentially the same as those of the Collective Members. This action is properly maintained as a collective action because in all pertinent aspects the employment relationship of individuals similarly situated to Plaintiff is identical or substantially similar.  Specifically, all non-exempt, hourly wage employees are entitled to be paid overtime wages for all hours worked in excess of forty (40) in a given week.  SourceTek, at the instruction of Innovation Refunds, instructed their hourly, non-exempt employees to only

record forty (40) hours worked per week regardless of the actual hours worked and thus systematically deprived them of the overtime compensation they are due.

165.    The Collective Members perform or have performed the same or similar work as Plaintiffs.

166.    SourceTek's failure to pay overtime compensation required by the FLSA results from generally applicable policies or practices and does not depend on the personal circumstances of Plaintiffs or the Collective Members.

167.    The claims of all Collective Members arise from a common nucleus of facts. Liability is based on a systematic course of wrongful conduct by SourceTek that caused harm to all of the Collective Members.

168.    SourceTek was aware or should have been aware that federal law prohibited them from not paying their employees all overtime wages as required by the FLSA.

169.    SourceTek's unlawful conduct has been widespread, repeated, and consistent.

170.    This action is properly brought and maintained as an opt-in collective action pursuant to 29 U.S.C. § 216(b).

171.    Upon information and belief, the individuals similarly situated to Plaintiffs contains more than one hundred (100) individuals.  The exact number or identification of similarly situated employees is presently unknown.  The identity and number of the employees is ascertainable and can be determined from SourceTek and Innovation Refunds' records.

172.    Notice can be provided to the Collective Members by First Class Mail to the last address known to the Defendants, via email at the last known email address known to the Defendants, and by text message to the last known telephone number known to the Defendants.

**COUNT I – VIOLATION OF THE FEDERAL WARN ACT**

173.     Plaintiffs, Lyons, and Taveras, by this reference, adopt and re-assert all allegations, averments, and statements of fact contained in the preceding paragraphs of this Complaint.

174.     Plaintiff and other affected employees who have worked for Innovation Refunds and SourceTek are entitled to the rights, protections, and benefits provided under the federal WARN Act, 29 U.S.C. § 2101 et. seq.

175.     Defendants are subject to the notice and back pay requirements of the federal WARN Act because the Defendants are a business enterprise that employed 100 or more employees, excluding part-time employees, and/or, employed 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of overtime), as defined in the WARN Act. 29 U.S.C. §§ 2101(1)(A) and(B).

176.     Plaintiff, and all other similarly situated employees, were not provided any advance notice of their job losses.

177.     Defendants engaged in conducting a plant closing but have not provided affected employees with the required notice, in violation of the federal WARN Act.

## COUNT II – VIOLATION OF THE FAIR LABOR STANDARDS ACT – INNOVATION REFUNDS SUBCLASS

178.     Plaintiff, Lyons, by this reference, adopts and re-asserts all allegations, averments, and statements of fact contained in the preceding paragraphs of this Complaint.

179.     By failing to include Plaintiff and all other hourly, nonexempt employees' nondiscretionary, performance-based pay into the calculation of each employee's "regular rate of pay," Innovation Refunds has failed to pay the required overtime compensation as mandated by 29 U.S.C. § 207.

180.     Although at this stage, Plaintiff and the Collective Members are unable to state the exact amount owed for all overtime wages that have not been paid, Plaintiffs and the Collective

Members believe that such information will become available during the course of discovery. Furthermore, when an employer fails to keep complete and accurate time records, employees may establish the hours worked by their testimony, and the burden of overcoming such testimony shifts to the employer.

181.    Innovation Refunds knew that – or acted with reckless disregard as to whether – its refusal or failure to properly compensate Plaintiffs and the Collective Members for their overtime work would violate the FLSA.

182.    Innovation Refunds was aware of the FLSA's overtime compensation requirements.

183.    As such, Innovation Refunds' conduct constitutes a willful violation of the FLSA.

184.    As a result of Innovation Refunds' failure or refusal to pay Plaintiffs and the Collective Members the overtime compensation deserved, Innovation Refunds violated 29 U.S.C. § 207(a). Plaintiffs and the Collective Members are therefore entitled to compensation of the overtime compensation shortfall to be proven at trial, plus an additional equal amount as liquidated damages, together with interest, reasonable attorney's fees, and costs.

## COUNT III – VIOLATION OF THE FAIR LABOR STANDARDS ACT – SOURCETEK SUBCLASS

185.    Plaintiffs, Taveras, by this reference, adopt and re-assert all allegations, averments, and statements of fact contained in the preceding paragraphs of this Complaint.

186.    By instructing Plaintiff and all other hourly, nonexempt employees to not include all hours that were worked during each workweek, the Defendants have failed to pay the required overtime compensation as mandated by 29 U.S.C. § 207.

187.    Although at this stage, Plaintiff and the Collective Members are unable to state the exact amount owed for all overtime wages that have not been paid, Plaintiffs and the Collective

Members believe that such information will become available during the course of discovery. Furthermore, when an employer fails to keep complete and accurate time records, employees may establish the hours worked by their testimony, and the burden of overcoming such testimony shifts to the employer.

188.     The Defendants knew that – or acted with reckless disregard as to whether – their refusal or failure to properly compensate Plaintiffs and the Collective Members for their overtime work would violate the FLSA.

189.     The Defendants were aware of the FLSA's overtime compensation requirements.

190.     As such, the Defendants' conduct constitutes a willful violation of the FLSA.

191.     As a result of the Defendants' failure or refusal to pay Plaintiffs and the Collective Members the overtime compensation deserved, the Defendants violated 29 U.S.C. § 207(a). Plaintiffs and the Collective Members are therefore entitled to compensation for the overtime compensation shortfall to be proven at trial, plus an additional equal amount as liquidated damages, together with interest, reasonable attorney's fees, and costs.

## JURY TRIAL DEMAND

192.     Plaintiffs demand trial by jury on all counts.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs request this Court enter the following relief:

    a.   Declare and find that the Defendants have violated the federal WARN Act, 29 U.S.C. § 2101 *et seq.*;

    b.   Declare and find that the Defendants have violated the FLSA, 29 U.S.C. § 201 *et seq.*;

    c.   Certify this case as a class action;

d.   Certify this case as a collective action;

e.   Award compensatory damages and penalties, in an amount according to proof;

f.   Award liquidated damages;

g.   Award pre- and post-judgment interest;

h.   Award reasonable attorneys' fees, costs, and expenses; and

i.   Award any and all additional relief the Court may deem appropriate.


Respectfully Submitted,

**CHAD LYONS and CHRISTIAN TAVERAS**


By:      /s/ William "Jack" Simpson
         William "Jack" Simpson, MBN 106524
         **LANGSTON & LOTT, PLLC**
         100 South Main Street
         Post Office Box 382
         Booneville, MS  38829-0382
         Telephone: (662) 728-9733
         Facsimile: (662) 728-1992
         Email: jsimpson@langstonlott.com
         *Admitted Pro Hac Vice*

         Timm W. Reid AT0006547
         **REID LAW FIRM, P.L.L.C.**
         100 Court Avenue Suite 315
         Des Moines, Iowa 50309
         Telephone: (515) 381-9842
         Facsimile: (515) 219-8746
         Email: timm@treidlawfirm.com

         *Attorneys for Plaintiffs*